IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH – NORTHER DIVISION

| | |
|---|---|
| IOSTAR Corporation, a Delaware company,<br><br>  Plaintiff,<br><br>v.<br><br>JAMES STUART, an individual; GEORGE French, an individual; RICHARD BUSCH, an individual; COMTACT CORPORATION, a Florida Company; and SPACE STATION DEVELOPMENT CORPORATION, a Wisconsin Company,<br><br>  Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br><br>Case No. 1:07-CV-133 |

  Pending before the Court are the following motions:  (1) Defendant James Stuart's Motion for Partial Summary Judgment, (2) Defendant George French's Motion for Summary Judgment on all Claims Asserted Against him, (3) Defendant Richard Busch's Motion for Summary Judgment, (4) IOSTAR and Robert D'Ausilio's Motion for Summary Judgment on the First and Second Causes of Action of James Stuart's Counterclaim and Third Party Complaint, and (5) IOSTAR and Robert D'Ausilio's Motion for Summary Judgment on George French's Counterclaim.  The Court heard oral argument on December 8, 2008, at which time it denied Plaintiff's Motion for Preliminary Injunction and Mr. French's Motion to Strike Mr. D'Ausilio's Declaration, and granted James Stuart's Motion for Summary Judgment with respect to IOSTAR's fraud claim against him.  IOSTAR and Robert D'Ausilio were represented by Robert Lochhead, Michael Black, and Craig Parry.  George French was represented by Samuel Straight

and John Mackay.  Richard Busch was represented by Richard Ensor.  James Stuart was

represented by Bradley Strassberg and Richard Rappaport.  Following argument, the Court took

the above matters under advisement.

## BACKGROUND

### I.    The Plaintiff

IOSTAR is an aerospace corporation seeking to develop on-board nuclear power for

satellites.  According to IOSTAR, its proprietary nuclear power design is a superior source of

power for satellites, having both private and public benefits.  Founded in 1986 by Robert

D'Ausilio, IOSTAR claims to have spent millions of dollars developing its technology, its

business model, and many proprietary and confidential trade secrets.  Among these alleged

proprietary and confidential trade secrets are a number of documents, including technical reports

and advances, contractual agreements, information obtained during studies, IOSTAR's program

management plan, pricing analyses, financial information, briefings, and technical summaries.

IOSTAR is currently seeking a loan from the federal government in order to develop and

market its nuclear power technology.  According to IOSTAR, Mr. D'Ausilio played an influential

role in drafting a bill which was enacted as the Commercial Reusable In-Space Transportation

Act ("CRISTA") of 2002.  This Act provides up to $1.5 billion in loan funding for "the

production of cost-effective, in-space transportation systems."  CRISTA § 902(1).  In order to

obtain such a loan, IOSTAR states that it needs approximately $300 million in funds and assets

on hand.

### II.    The Defendants

In late 2004, Richard Busch contacted IOSTAR concerning a communications satellite

project.  According to Mr. Busch, he had designed a unique and innovative technology to be

employed in communications satellites.  Mr. Busch sought IOSTAR's support in order to move forward on the project.

On December 2, 2004, Mr. Busch, on behalf of Xigix Technologies LLC, entered into a non-disclosure agreement with IOSTAR.  Under the terms of the non-disclosure agreement, Mr. Busch and IOSTAR agreed to exchange proprietary and confidential information necessary to move forward on the project.  Additionally, IOSTAR's standard non-disclosure agreement provided that Mr. Busch was entitled to retain an archive copy of all confidential documentation he received pursuant to the agreement.  In accordance with this agreement, Mr. Busch received a number of documents that IOSTAR contends are trade secret.  In May 2005, IOSTAR received $500,000 related to the Xigix project.

During this time period, James Stuart was also involved with IOSTAR.  Mr. Stuart first became acquainted with Mr. D'Ausilio and his company in 1988.  Sometime in the early 2000s, Mr. Stuart joined IOSTAR's Board of Directors.  In 2003, Mr. Stuart and Mr. D'Ausilio executed an Engagement Agreement through which Mr. Stuart became designated as IOSTAR's President.  Mr. Stuart was expected to raise the funds required to obtain the $1.5 billion CRISTA loan, deal with strategic issues, and serve as the chief spokesperson of IOSTAR.  Additionally, the Engagement Agreement stated that Mr. Stuart was to serve at the pleasure of the CEO and Board of Directors.  The Engagement Agreement also incorporated the terms of IOSTAR's standard non-disclosure agreement.

In the process of raising funds for IOSTAR, Mr. Stuart approached a long-time business acquaintance, George French.  Mr. French is a shareholder in various aerospace companies and serves as one such company's CEO.  Since Mr. French felt that IOSTAR's technology

strategically fit with his companies operations, he became interested in a business relationship with IOSTAR.

In September 2006, IOSTAR made an investor presentation to Mr. French as a potential investor and began sending numerous documents to Mr. French's staff.  On January 8, 2007, Mr. French signed IOSTAR's standard non-disclosure agreement.  Following another investor presentation in late January 2007, Mr. French and IOSTAR executed a Term Sheet and Letter of Intent that described the parties' envisioned relationship.  Pursuant to the two agreements, Mr. French received numerous documents that IOSTAR contends are trade secret, confidential, and subject to Mr. French's non-disclosure agreement.

The Letter of Intent agreed upon by Mr. French and IOSTAR described a process through which Mr. French would become the majority shareholder of IOSTAR.  Under this agreement, the parties agreed to execute a formal Memorandum of Understanding within 7 days, and a Definitive Agreement within 30 days thereafter.  Upon execution of the Memorandum of Understanding, Mr. French would become obligated to fund all IOSTAR operation costs for up to 30 days.  Upon execution of the Definitive Agreement, Mr. French would continue funding all IOSTAR operation costs.  In return, IOSTAR was to issue IOSTAR shares of stock and proxies to Mr. French upon the occurrence of various milestones.  Upon execution of the Memorandum of Understanding, Mr. French was to become IOSTAR's CEO, a Board member, and was to be issued proxies and a controlling share of IOSTAR's common stock.  At execution of the Definitive Agreement, Mr. French was to become IOSTAR's chairman.  A provision of the Letter of Intent provided that Mr. French's "monthly investment fundings [would] be monthly purchases of Preferred shares of IOSTAR."  Def. French's Mem. in Supp. of Summ. J., Ex. B at 2.  In the event the Definitive Agreement did not come to fruition, the funds invested by Mr. French were

to be converted to a Note.  Subsequently, no Memorandum of Understanding was executed, nor did the parties enter into the Definitive Agreement.  Nevertheless, Mr. French claims he traveled and made presentations on behalf of IOSTAR, worked toward securing funding for IOSTAR, worked on the loan process for IOSTAR, used and paid his staff and consultants to work on behalf of IOSTAR, and paid the salary of IOSTAR's President, Mr. Stuart.

The Letter of Intent not only described the relationship envisioned by the parties, it also made certain representations about the state of IOSTAR.  One such representation was that Mr. D'Ausilio had personally borrowed $327,000 of the Xigix funds from an escrow account and had executed a corresponding Note to IOSTAR.  Investigation by Mr. French revealed that no Note to IOSTAR existed, and the Xigix funds were never placed in escrow.

## III.    Strained Relationships

By early to mid-2007, all of the defendants' relationships with IOSTAR and Mr. D'Ausilio had become strained.  Mr. D'Ausilio and his wife (IOSTAR's Corporate Secretary) began resisting Mr. French's efforts to acquire a controlling share in IOSTAR.  At roughly this same time, Mr. French decided that "IOSTAR was too tainted to move forward" and withdrew his offer to acquire IOSTAR.  Mr. French's Dep. at 129, lines 14-25.

Despite Mr. French's decision to revoke his offer, he remained interested in IOSTAR.  According to IOSTAR, Mr. French offered to purchase the assets of IOSTAR instead of the stock.  Additionally, in August 2007, Mr. Stuart and Mr. French discussed "Plan A" and "Plan B."  According to Mr. Stuart, "Plan A" concerned devising a method for Mr. French to acquire IOSTAR.  "Plan B," on the other hand, concerned the possibility of establishing a competing entity to compete with IOSTAR without utilizing IOSTAR's patents or intellectual property.

According to the defendants, the discussion concerning the latter plan was brief and entirely conceptual.

By the summer of 2007, Mr. Stuart and Mr. D'Ausilio's relationship had reached a critical point of disintegration.  In December 2006, Mr. Stuart discovered over $300,000 missing from the Xigix project funds.  When Mr. Stuart confronted Mr. D'Ausilio about the funds, Mr. D'Ausilio acknowledged that he had spent the funds, and he promised to return the funds to the Xigix account.  Mr. D'Ausilio agreed to execute a Note to evidence this obligation.  Mr. D'Ausilio did not execute a Note.

On June 1, 2007, the IOSTAR Board passed a resolution stating that Mr. D'Ausilio's use of the Xigix funds was unauthorized, personal, and without the Board's knowledge.  The Board directed Mr. D'Ausilio to repay the money within 30 days.  Subsequently, on June 11, 2007, and again on June 26, 2007, Mr. Stuart and members of the Board sent letters to Mr. D'Ausilio demanding that he repay the Xigix project funds.  The June 26, 2007, letter also stated that should Mr. D'Ausilio fail to repay the funds by July 1, 2007, Mr. Stuart and other Board members would "have no choice but to resign."  Stuart's Mem. in Opp. to IOSTAR's Mot. for Summ. J., Ex. 9.  Mr. D'Ausilio did not repay the funds within 30 days of the resolution as he was directed.

On July 5, 2007, Mr. Stuart resigned from his position as IOSTAR's President.  According to Mr. Stuart, he had no choice but to resign based on Mr. D'Ausilio's failure to repay the Xigix project funds and the fact that Mr. D'Ausilio demanded that he "stop causing trouble" and stop "stir[ring] up" the Board.  *Id.* at 9.  Later that month, on June 26, 2007, the IOSTAR Board voted to remove Mr. Stuart from his position as a Board member.

**IV.     The September 11, 2007, Email**

By the fall of 2007, then, Mr. Stuart was no longer affiliated with IOSTAR in any

capacity, and all of the efforts to bring in Mr. French as a major investor or owner of IOSTAR

had ended with no success.  Mr. Busch also had no direct involvement as an investor in IOSTAR,

though he continued his employment relationship with Xigix.  Sometime in late summer or early

fall of 2007 these three men had some discussions about forming a business in the field of

communications satellites and satellite power systems.  These discussions led to the preparation

of a draft Memorandum of Understanding.  The document had signature lines for Mr. French and

Mr. Busch, mentioned Mr. Stuart's name, and generally describes a business venture that was to

be involved in the same field as IOSTAR.  One copy of the draft Memorandum of Understanding

was sent in an email addressed to Mr. Stuart, apparently at an email address he had at IOSTAR.

Apparently because Mr. Stuart was no longer associated with IOSTAR, Mr. D'Ausilio received

the email on September 11, 2007.  It was that event that led very shortly thereafter to the filing of

this lawsuit on October 9, 2007.

Mr. D'Ausilio and IOSTAR believe that Mr. Stuart, Mr. French, and Mr. Busch are

planning to launch a new company using IOSTAR's trade secrets and other proprietary

information.  Among other remedies, IOSTAR seeks preliminary and permanent injunctive relief.

IOSTAR sought expedited discovery, and the Court issued an order directing the parties to

complete fact discovery by July 2, 2008.  Now, after a full year of fact discovery which is

complete, IOSTAR has discovered little additional evidence that the defendants are using, or are

planning to use, its confidential information.  IOSTAR's allegations are essentially based on the

following facts: (1) the September 11, 2007, Memorandum of Understanding; (2) a chain of

emails exchanged between Mr. Stuart and Mr. Busch on July 4, 2007, and again on July 13, 2007,

discussing IOSTAR's technology and certain specifications; (3) the defendants' retention of documents and information that IOSTAR contends are trade secret; and (4) a Mutual Confidentiality and Non-Disclosure Agreement, contemplating a business relationship, that was entered into by Mr. French and Mr. Busch on June 22, 2007.  These facts are virtually the same facts IOSTAR had when it first filed this suit.  IOSTAR's main argument is that these facts show threatened misuse of IOSTAR's trade secrets by the defendants.

In response to the allegations by IOSTAR, each defendant has stated that he has no intention of competing with IOSTAR in any way that utilizes IOSTAR's confidential information, trade secrets, or intellectual property.  The defendants also state that discussions concerning a competing venture were completely conceptual, brief, and only concerned whether it was possible to compete with IOSTAR without utilizing any of IOSTAR's intellectual property.  The defendants also filed counterclaims against IOSTAR and third-party complaints against Mr. D'Ausilio, Mrs. D'Ausilio, and Patrick Rau (whom Mr. French alleges is IOSTAR's CFO).

## DISCUSSION

### I.    Defendants' Motions for Summary Judgment

Summary judgment is appropriate where the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  When applying this standard, the court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."  *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).  This does not mean, however, that "a scintilla of evidence in support of the nonmovant's position is []sufficient to create a dispute of fact that is 'genuine.'"  *Garrison v.*

*Gambro, Inc.*, 150 Fed. Appx. 819, 821 (10th Cir. 2005).  To defeat summary judgment, the evidence must be "such that a reasonable jury could find in favor of the nonmovant."  *Id.*

In the present case, IOSTAR's claims are unable to survive summary judgment.  There are insufficient facts to support any of its claims for relief.

A.     **IOSTAR's Causes of Action Alleging Violation of the Utah Uniform Trade Secrets Act, Conversion, Civil Conspiracy, Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty, Breach of Implied Duty of Good Faith, and Breach of Contract**

Many of IOSTAR's causes of action turn on the same nucleus of operative facts–namely that Mr. Busch, Mr. French, and Mr. Stuart all received confidential, proprietary, and trade secret information, then discussed creating a venture that would compete with IOSTAR.  Viewing these facts in the light most favorable to IOSTAR, IOSTAR has shown that the defendants all remain in possession of documents and information it alleges are trade secret.  Additionally, IOSTAR has shown that the parties contemplated a competing venture that bears similarities to IOSTAR.  Finally, IOSTAR has shown that Mr. Stuart and Mr. Busch, although technically entitled to exchange information due to their relationships with IOSTAR, exchanged emails discussing IOSTAR technical information at a time that raised IOSTAR's suspicions.  Viewing these facts in the light most favorable to IOSTAR, IOSTAR falls far short of presenting genuine issues of material fact.

(1) <u>IOSTAR's Claim Based on the Utah Uniform Trade Secrets Act</u>

IOSTAR acknowledges that it is unable to identify any actual misappropriation of its trade secrets by the defendants.  Nevertheless, IOSTAR contends that the Utah Uniform Trade Secrets Act provides an injunctive remedy for the defendants' behavior.  The Act states as follows: "[a]ctual or threatened misappropriation [of a trade secret] may be enjoined."  Utah

-9-

Code Ann. § 13-24-3 (West 2008).   IOSTAR claims that it has presented facts showing "threatened" misappropriation.   IOSTAR argues there is a grave risk that the defendants will use IOSTAR trade secrets as they attempt to compete.   IOSTAR's estimate of the adequacy of its facts, and its legal construction, are both incorrect.

IOSTAR's construction of "threatened" appears to be synonymous with "risk."  A risk of misappropriation, however, is far too tenuous upon which to justify a remedy as extraordinary as an injunction, or to support a violation of the Act.  This is particularly true in a case such as this where the defendants are already contractually bound to keep information confidential, have clearly stated they have no intention of using IOSTAR's information, and have undisputedly not done so for more than a year since the September 11 Memorandum of Understanding was inadvertently sent to Mr. D'Ausilio.

The United States Supreme Court recently instructed that at the pleading stage, factual allegations must be based on more than speculation to survive a motion to dismiss.  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007).  It logically follows that if a claim based on speculation is insufficient to survive a pre-discovery motion to dismiss, certainly a claim based on speculation is unable to survive a motion for summary judgment.  Furthermore, if the Court were to interpret the Act in a way that provided for an injunction based on a risk of misuse or misappropriation, the Court would essentially be creating a mandatory injunction anytime a party lawfully obtains trade secret information and then leaves his employer to take a position in the same or a similar field.  In many instances, this could even create an implied statutory non-compete clause simply by lawfully receiving and lawfully possessing trade secret information.

IOSTAR cites only one case for its proposition that facts creating a risk of misappropriation, and nothing more, are sufficient to overcome summary judgment.  In *Cattz,*

*Inc. v. 4-L Mfg., Inc.*, 1999 WL 1063087 (Neb. App. 1999), the Nebraska Court of Appeals held that summary judgment on a trade secrets claim was not appropriate for a claim based on threatened misappropriation.  *Cattz*, however, is easily distinguishable from this case.

Although the Court in *Cattz* stated that "[a] claim of 'threatened misappropriation' . . . seems inherently unsuitable for resolution by summary judgment," *Id.* at 11, the facts and reasonable inferences in that case established much more than mere risk of use.  There, allegations and some additional evidence showed that the defendant had actually manufactured and intended to sell 500 trailer hitches without authorization.  *See id.* at 2, 11.  Furthermore, the plaintiff in *Cattz* provided testimony that the defendant had made certain statements showing that it intended to sell hitches without authorization and in breach of the parties' agreement.  *Id.* at 12.

The "threatened" improper use of the plaintiff's property in *Cattz* is clearly within the meaning of the Act.  By contrast, IOSTAR proffers nothing even remotely similar.  IOSTAR has not identified any statements made by the defendants showing they intend to misuse trade secret information.  IOSTAR admitted during oral argument that it cannot, and does not take the position that the defendants are unable to compete without using IOSTAR's confidential information.  Without such facts, all IOSTAR can show based on the record now before the Court is a risk of misappropriation; yet such a risk is inherent every time an affiliated party acquires trade secret information and then later becomes a competitor, or more accurately in this case, a possible competitor.

Regardless what the drafters of the Act envisioned by using the word "threatened," it is clear that a mere risk of misappropriation of a trade secret, without more, is an insufficient basis upon which to issue an injunction.  Without a single fact showing the defendants in this case

wrongfully acquired confidential information, or that the defendants intend to use IOSTAR's trade secrets to compete, beyond the suspicions raised in Mr. D'Ausilio's mind by the September 11, 2007, Memorandum of Understanding, there are not enough facts presented here to allow the plaintiff's claims under the Utah Uniform Trade Secrets Act to survive summary judgment.  In this case, the risk that the defendants will use IOSTAR's trade secrets in order to compete is an insufficient basis for any reasonable jury to find that the defendants' actions establish threatened misappropriation of trade secrets in violation of the Act.  This is particularly true because the defendants remain contractually bound to abide by their non-disclosure agreements.  Accordingly, the defendants' motions for summary judgment on IOSTAR's trade secrets violation claims are granted, and IOSTAR's second cause of action is dismissed with prejudice.

### (2) IOSTAR's Claims for Conversion, Civil Conspiracy, Breach of Fiduciary duty, and Aiding and Abetting Breach of Fiduciary duty

IOSTAR has also asserted causes of action against the defendants for conversion, civil conspiracy, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty.  All of these causes of action, except for possibly the claims involving breach of fiduciary duty, are generally based on the alleged misappropriation or threatened misappropriation of trade secrets.

The defendants collectively argue that the Utah Uniform Trade Practices Act preempts each of these causes of action, as IOSTAR has not argued a basis apart from its allegations of trade secret misappropriation.  The Act states that it "displaces conflicting tort, restitutionary, and other law[s] of [Utah] providing civil remedies for misappropriation of a trade secret."  Utah Code Ann. § 13-24-8 (West 2008).

IOSTAR unwaveringly argues that the information possessed by the defendants is trade secret and protected by the Act.  Since this is clearly IOSTAR's theory, a persuasive argument

can be made that the above referenced causes of action are preempted by IOSTAR's own

argument.  IOSTAR has admitted that its only basis for most of its non-contract based claims is

the same alleged conduct that it claims supports its trade secrets cause of action.  Taking

IOSTAR's allegations as true, the language of the Act would best be interpreted as preventing

IOSTAR from taking multiple bites at the apple.

IOSTAR does argue, however, that it has pled these non-contract based causes of action

in the alternative to account for a possible ruling by this Court that some, or all, of the

information possessed by the defendants is not trade secret.  In such a case, the Act would not

apply, and IOSTAR's alternative causes of action would not be preempted.

Given IOSTAR's position that the information possessed by the defendants is trade

secret, the Court finds that as applied to IOSTAR, the above referenced causes of action are

preempted.  Even without such a finding, however, the absence of factual support for IOSTAR's

arguments is also fatal.

<u>Conversion</u>.  To prevail on a claim for conversion, a plaintiff must show willful

interference with a chattel that deprives the owner of the chattel's use and possession.  *Jones v.

Salt Lake City Corp.*, 78 P.3d 988, 992 (Utah App. 2003).  In addition to interference, a plaintiff

"must [also] show that he or she is entitled to immediate possession of the property at the time of

the alleged conversion."  *Id.* (quoting *Fibro Trust v. Brahman Fin., Inc.*, 1999 UT 13, ¶ 20, 974

P.2d 288) (internal quotations omitted).  IOSTAR cannot establish these elements for two

reasons.

First, IOSTAR has not presented sufficient facts to show that the defendants willfully

interfered with a chattel.  Each defendant entered into a non-disclosure agreement with IOSTAR

providing for the exchange of confidential information.  Additionally, IOSTAR appears to have

retreated from any argument that the defendants acquired information or documents in an unlawful manner.  Finally, the non-disclosure agreements signed by the defendants provided that each defendant could retain an archive copy of all documents received.  Based on this, no evidence shows that the defendants have wrongfully interfered with IOSTAR's use or possession of a chattel.

Second, IOSTAR cannot show that it is entitled to immediate possession of the documents possessed by the defendants.  As just mentioned, the non-disclosure agreements contained a clause allowing each defendant to keep an archive copy of all confidential documents received pursuant to the agreements.  Although IOSTAR now contends that the defendants should not be permitted under the contract to retain copies of confidential documents while planning to compete, the non-disclosure agreements do not contain a non-compete clause, nor do they qualify the defendants' retention of archive copies on a covenant not to compete.  IOSTAR has presented no facts upon which a reasonable jury could return a verdict in its favor on its conversion claim.  Therefore, the defendants' motions for summary judgment in this respect are granted, and IOSTAR's first cause of action is dismissed with prejudice.

Civil Conspiracy.  To prove civil conspiracy, a plaintiff must show "(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof."  *Israel Pagan Estate v. Cannon*, 746 P.2d 785, 790 (Utah Ct. App. 1987).  As a matter of law, IOSTAR has not come forward with sufficient evidence to prove these elements.

As discussed in detail above, the evidence in the record does not show that the defendants have engaged in any unlawful acts.  Nor has IOSTAR shown that it has sustained any damages either.  IOSTAR contends only that damages are threatened by the defendants' actions.  Without

present damages, IOSTAR's civil conspiracy claims cannot survive.  Accordingly, the

defendants' motions for summary judgment on IOSTAR's civil conspiracy claims are granted,

and the Court dismisses IOSTAR's fourth[1] cause of action with prejudice.

   <u>Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty</u>.  IOSTAR

alleges that Mr. Stuart breached his fiduciary obligations to the Company, and that Mr. Busch

and Mr. French aided and abetted this breach.  IOSTAR's complaint alleges that

> [b]y virtue of his position at IOSTAR, Stuart owed certain fiduciary duties,
> including but not limited to a duty of loyalty to IOSTAR, a duty not to disclose
> IOSTAR's Trade Secrets and confidential business information, a duty not to use
> IOSTAR's Trade Secrets and confidential business information to compete
> unfairly with IOSTAR, a duty not to use IOSTAR's Trade Secrets and
> confidential business information for the benefit of any new business, a duty not
> to develop or work on competing business enterprises while employed by or
> affiliated with IOSTAR, or otherwise utilizing IOSTAR's resources and property
> . . . a duty not to compete with IOSTAR while employed or affiliated with
> IOSTAR, a duty of fair dealing, honesty, and to disclose all material facts to
> IOSTAR, and a duty to return all of IOSTAR's Trade Secrets, confidential
> information, and other property upon separation from the company.

(IOSTAR's Comp. at ¶ 69).  These causes of action are based on virtually the same

allegations as the rest of IOSTAR's causes of action—namely that Mr. Stuart and the

other defendants intend to compete with IOSTAR and this creates a risk that the

defendants will use IOSTAR trade secrets.  As discussed above, IOSTAR has not

identified sufficient facts upon which a reasonable jury could return a verdict in its favor.

   IOSTAR has argued briefly that these causes of action are based on more than just

misappropriation of trade secrets.  IOSTAR claims that Mr. Stuart's relationship with IOSTAR

was orchestrated with the goal of taking over IOSTAR.  In support of this position, IOSTAR

points to the following facts.  First, Mr. Stuart and Mr. French had a longstanding relationship.

---

[1]Labeled as "Fifth" in IOSTAR's complaint.

Second, Mr. Stuart worked to promote Mr. French's acquisition of the Company.  Third, Mr. French's successful acquisition of IOSTAR would have benefitted Mr. Stuart personally. Fourth, Mr. Stuart wanted to remove Mr. D'Ausilio from his position within the Company. Fifth, after Mr. French's acquisition of the Company failed, the defendants discussed a competing entity.

Taking all of the above facts as true, IOSTAR's claim for breach of fiduciary duty fails as a matter of law.  With the exception of alleging that Mr. Stuart's actions were taken at the expense of IOSTAR and Mr. D'Ausilio, IOSTAR has presented no facts upon which a reasonable jury could determine that Mr. Stuart breached his duty of loyalty to IOSTAR. IOSTAR has presented no facts supporting its claim that Mr. Stuart's actions were not in the best interests of IOSTAR.  And although Mr. Stuart's actions may have not always been in the best interests of Mr. D'Ausilio, this does not mean that Mr. Stuart breached his fiduciary duty to IOSTAR.  As an officer and director, Mr. Stuart owed a fiduciary duty of loyalty to IOSTAR, not to Mr. D'Ausilio personally.

IOSTAR briefly argued that Mr. Stuart breached his fiduciary duty to IOSTAR by discussing a competing venture with Mr. Busch and Mr. French.  IOSTAR has not cited sufficient facts to show that Mr. Stuart began such discussions until after his affiliation with the company had ended.  Without such facts, IOSTAR cannot succeed on its claim.  Because IOSTAR's claims against Mr. Stuart fail as a matter of law, the accompanying claims against Mr. French and Mr. Busch for aiding and abetting fail as well.  The Court grants the defendants' motions with respect to these causes of action and dismisses IOSTAR's fifth and thirteenth causes of action without prejudice.

(3) IOSTAR's Claims of Breach of Implied Covenants of Good Faith and Breach of Contract

IOSTAR alleges that Mr. French and Mr. Stuart have each breached implied covenants of good faith under their respective agreements with IOSTAR by retaining archive copies of its trade secrets while intending to establish a competing venture.  Additionally, IOSTAR alleges that Mr. French breached his obligations under his non-disclosure agreement and that Mr. Stuart breached his obligations to IOSTAR under his Engagement Agreement and corresponding non-disclosure agreement.  These allegations also stem from Mr. Stuart's and Mr. French's retention of archive-copy documents while intending to compete.

Breach of the implied covenant of good faith.  An implied covenant of good faith and fair dealing inheres in virtually every contract and prohibits parties to an agreement from doing anything intentionally that prevents another from receiving the expected benefits of the agreement. *Eggett v. Wasatch Energy Corp.*, 2004 UT 28 ¶ 14, 94 P.3d 193.  IOSTAR misstates how this duty applies to the defendants, however, as IOSTAR has not even argued that the actions of the defendants prevented it from receiving any expected benefits flowing from the non-disclosure agreements.

IOSTAR contends that Mr. French and Mr. Busch have violated the implied covenant of good faith by possessing trade secret documents while planning to compete with it.  The very agreements that IOSTAR contends the defendants are violating, however, do not condition retention of documents on a covenant not to compete.  IOSTAR's standard non-disclosure agreement states that "each party may retain one copy of all documents for archival purposes," without conditioning retention on anything.  *See* Def. French's Mem. in Supp. of Summ. J., Ex. A ¶ 2c.  Although the defendants are certainly obligated to act in good faith with respect to their

-17-

rights and duties under the agreements, IOSTAR's entire basis for arguing that the defendants are acting in bad faith is its speculative argument that the defendants plan on using IOSTAR's proprietary information to compete with it.  If IOSTAR could identify facts showing that the defendants intend to use IOSTAR's confidential information to compete with it, perhaps IOSTAR's claim could survive summary judgment.  As discussed above, this argument is too tenuous and speculative for the Court to find that the defendants have acted inappropriately.

The Court cannot find that the defendants' plans to compete with IOSTAR logically lead to a conclusion that the defendants intend to use IOSTAR's trade secrets, or that the defendants' retention of archive copies, as provided for in their agreements with IOSTAR, interferes with IOSTAR's rights under the agreements.  Without a single fact showing that the defendants intended to use IOSTAR's trade secrets or interfere with IOSTAR's rights, a reasonable jury could not find that the defendants are acting in bad faith under their non-disclosure agreements.[2] The defendants' motions for summary judgment on IOSTAR's claims against Mr. French and Mr. Stuart for breach of the implied covenant of good faith are granted, and IOSTAR's ninth cause of action is dismissed with prejudice.

Breach of Contract.  IOSTAR alleges Mr. Stuart and Mr. French have breached the express terms of their agreements with IOSTAR.  IOSTAR seems to argue that the defendants have improperly disclosed proprietary information to third parties, and that the defendants have used IOSTAR proprietary information in a manner not permitted by their non-disclosure agreements.  Again, IOSTAR has not presented specific facts showing how or when Mr. Stuart or Mr. French violated the terms of their non-disclosure agreements.  Rather, IOSTAR once

---

[2] Additionally, were IOSTAR able to prove at some future time that the defendants had used IOSTAR's information inappropriately, this would be a violation of the express terms of the agreements—not a violation of an implied duty of good faith and fair dealing.

again argues that the defendants cannot retain copies of IOSTAR documents while intending to compete.  *See* IOSTAR's Mem. in Opp. to Stuart's Mot. for Partial Summ. J. at 8; IOSTAR's Mem. in Opp. to French's Mot. for Summ. J. at 13.  As discussed above, this argument is based on speculation and conjecture.  Since IOSTAR is unable to show any specific instances of how Mr. Stuart or Mr. French has misused or wrongfully disclosed information covered by their agreements with IOSTAR, IOSTAR cannot be successful on its claim for breach of contract.[3] The defendants' motions for summary judgment on these causes of action are therefore granted, and IOSTAR's seventh and eighth causes of action are dismissed with prejudice.

**B.      Mr. Stuart's Claim for Repayment of Attorney Fees**

Mr. Stuart has moved for summary judgment on his claim for repayment of attorney fees. Mr. Stuart contends that he sought legal advice on behalf of the IOSTAR Board, and that the Board passed a resolution providing that IOSTAR would pay for such legal fees.  Although IOSTAR does not dispute that a Board resolution exists and that the Company is obligated to pay for certain legal fees, IOSTAR contends that the invoices submitted by Mr. Stuart relate to personal legal advice, not legal advice related to his position as an IOSTAR Board member. According to IOSTAR, these legal fees related to Mr. Stuart's personal conflicts, his dealings with Mr. French, and his stock options.  IOSTAR also argues that some of the legal fees incurred by Mr. Stuart related to his plan to remove Mr. D'Ausilio from his positions with IOSTAR and his goal of consummating Mr. French's buyout of IOSTAR.  Because IOSTAR has shown that a genuine issue of material fact exists concerning the nature of the legal advice received by Mr.

---

[3]Although IOSTAR seems to argue that Mr. Stuart's July 2007 email exchanges with Mr. Busch were inappropriate, the emails occured during a time when Mr. Stuart was still an agent of IOSTAR.  Therefore, technically Mr. Stuart had the authority as IOSTAR's agent to disclose the information.  Furthermore, Mr. Stuart acted in a manner to protect the confidentiality of the information disclosed by telling Mr. Busch that the information was confidential and subject to his non-disclosure agreement.

Stuart, summary judgment is not appropriate.  A reasonable jury could determine either that the legal fees incurred by Mr. Stuart were on behalf of the IOSTAR Board, or the legal fees were incurred by Mr. Stuart in his personal capacity.  Accordingly, Mr. Stuart's motion for summary judgment on his third cause of action is denied.

### C.   Mr. French and IOSTAR's Motions for Summary Judgment on Mr. French's Cause of Action for Violation of the Utah Uniform Securities Act

Mr. French and IOSTAR have filed cross-motions for summary judgment on Mr. French's Utah Uniform Securities Act claim.  Mr. French argues that IOSTAR violated the Utah Uniform Securities Act by making material misrepresentations in connection with the Letter of Intent.  IOSTAR argues that regardless whether material misrepresentations were made, Mr. French cannot prove damages under the Act.  As discussed below, because Mr. French never purchased any securities from IOSTAR, Mr. French's motion is denied and IOSTAR's motion is granted.

The Utah Uniform Securities Act provides that any person who makes a material misrepresentation in connection with the sale of a security can be held liable for damages.  *See* Utah Code Ann. § 61-1-1, 22(1)(a) (West 2008).  The Act provides that a purchaser can recover the difference between the amount paid for the security and any amount received upon tender of the security. § 61-1-22(1)(a).  Additionally, where the purchaser no longer owns the security, damages are recoverable measured by the amount recoverable upon tender less the value of the security upon disposal, plus interest. § 61-1-22(1)(b).

The above sections make clear that damages under the Securities Act are measured by the consideration paid for the security.  Potential purchasers do not have a cause of action.  *Levitz v.*

*Warrington*, 877 P.2d 1245, 1246 (Utah App. 1994).  In this case Mr. French was only a

potential purchaser of securities.

      Mr. French relies on a single statement from the Letter of Intent for his proposition that

he purchased shares of IOSTAR stock.  He contends that since the Letter of Intent states "[t]he

GDF monthly investment fundings will be monthly purchases of Preferred shares of IOSTAR,"

the fact that he provided funding is dispositive.  Def. French's Mem. in Supp. of Summ. J., Ex. B

at 2.  Taken in isolation, this quote would suggest that any investment expenditures made by Mr.

French on behalf of IOSTAR would be treated as purchases of IOSTAR stock.  This position,

however, takes the statement out of context.

      The Letter of Intent is separated into a number of distinct sections.  It begins by

providing an overview of the relationship the parties envisioned, proceeds to discuss IOSTAR's

stock structure and Mr. French's investment, and concludes by identifying the terms and

conditions to be agreed upon.  The statement relied upon by Mr. French is taken from the section

discussing Mr. French's investment, Preferred stock, and repurchase structure.  In contrast to this

statement, the Roadmap section of the Letter of Intent states that "[u]pon MOU execution, GDF

will fund all IOSTAR costs, for a period not to exceed 30 days."  Def. French's Mem. in Supp.

of Summ. J., Ex. B at 1 (emphasis added).  The Terms and Conditions section of the Letter of

Intent state that "[u]pon MOU execution, GDF will commit and begin to fund all IOSTAR

costs."  *Id.* at 3 (emphasis added).  The Terms and Conditions also state that the IOSTAR Board

will agree to "the issuance and sale of Shares and of preferred stock per MOU at time of MOU

execution."  *Id.* (emphasis added).  Finally, and perhaps most importantly, the Terms and

Conditions make certain that "[i]f the Definitive Agreement is not executed within 30 days of

MOU execution, the funds invested by GDF will be converted to a Note," repayable with interest

*Id.* at 3.  These other provisions indicate that without a signed Memorandum of Understanding, Mr. French had no obligation to invest funds, and IOSTAR had no obligation to issue stock. Ultimately, without a Definitive Agreement Mr. French was entitled to nothing more than repayment of his investment with interest–not preferred shares.

Mr. French places great weight on the fact that the parties agreed to bypass the Memorandum of Understanding phase and proceed directly to the Definitive Agreement stage. Although Mr. French states that the parties agreed to proceed as if the Memorandum of Understanding had been executed, Mr. French has not identified any facts showing the parties contemplated treating the rights and obligations that were contingent upon execution of the Memorandum of Understanding as if the memorandum had been executed.  Without facts showing a subsequent modification of the Letter of Intent, a reasonable jury could not find that any expenditure in funds by Mr. French purchased any Preferred shares.  Without such a purchase, there can be no loss attributable to a Securities Act violation.  Therefore, Mr. French's motion is denied, IOSTAR's motion is granted, and Mr. French's first claim for relief is dismissed with prejudice.[4]

## II.   IOSTAR, Mr. D'Ausilio, Sylvia D'Ausilio, and Patrick Rau's Motions for Summary Judgment

The counterclaim and third-party defendants, collectively referred to as IOSTAR, have moved for summary judgment on all claims asserted against them by Mr. French and the claims

---

[4] In so doing, the Court notes that Mr. French has not presented any facts upon which a reasonably jury could find that Sylvia D'Ausilio and Patrick Rau could be liable under the Securities Act either.  Aside from making the allegation that each of these persons aided and abetted Mr. D'Ausilio and IOSTAR in their course of conduct, Mr. French has not provided any facts to the Court upon which it could make such a finding.  Although conceivably Utah Code Ann. § 61-1-22(4)(a) (West 2008) could impose liability on Sylvia D'Ausilio as an officer of IOSTAR, were it not for the Court's dismissal of this cause of action, IOSTAR has not made any showing that Mr. Rau was such an officer and subject to liability.  At a minimum, IOSTAR has presented adequate facts showing that a genuine issue of fact exists concerning the positions that each of these persons held with IOSTAR.

asserted against them by Mr. Stuart for wrongful discharge and intentional interference with contractual relations.  For the reasons stated below, these motions are granted in part and denied in part.

    **A.**    **The Counterclaim and Third-Party Defendants' Motion for Summary Judgment on all Claims Asserted by Mr. French**

Mr. French has asserted causes of action against the counterclaim and third-party defendants for breach of contract, breach of the duty of good faith and fair dealing, fraudulent inducement, negligent misrepresentation, and promissory estoppel.  These allegations are largely the result of the failed relationship envisioned by the parties.

    (1) <u>Breach of Contract</u>

IOSTAR has moved for summary judgment on Mr. French's claim for breach of contract. Mr. French contends that IOSTAR breached the terms of the Letter of Intent in two ways.  First, Mr. French asserts that IOSTAR breached the Letter of Intent by making material misrepresentations that were embodied within the agreement.  Second, Mr. French asserts that IOSTAR breached the terms of the Letter of Intent by failing to provide him with IOSTAR stock.

Mr. French's allegations cannot survive summary judgment.  IOSTAR correctly notes that any material misrepresentations embodied within the Letter of Intent cannot serve as the basis for a breach of contract claim.  Although Mr. French properly points out that breaches of contract typically concern failing to perform promises or interfering with another's performance of a promise, *see* Black's Law Dictionary (8th ed. 2004); *Metro Oil Co., Inc. v. Sun Refining and Marketing Co.*, 936 F.2d 501, 504 (10th Cir. 1991), assertions embodied within the terms of an agreement are not the contractual obligations or promises subject to being breached.

A breach of a contract occurs where a party fails to complete the performance of obligations that are contemplated by the agreement.  *Id.*  Representations about the subject matter of the contract, however, are something entirely different.  Telling in this regard is that Mr. French has not presented any case law showing that an inaccurate statement or representation embodied within an agreement can serve as a basis for a breach of the agreement. This is not to say that a party has no remedy for false statements in an agreement.  The proper cause of action for such a misrepresentation, however, is one that seeks rescission or voidance of the contract—not breach.  *See Miller v. Celebration Mining Co.*, 2001 UT 64, ¶ 10, 29 P.3d 1231.

Additionally, IOSTAR has not breached the express terms of the Letter of Intent by failing to issue Mr. French IOSTAR stock.  First, the Letter of Intent is primarily concerned with describing the business relationship contemplated by the parties and obligating the parties to make certain agreements in the future.  The Letter of Intent is primarily an agreement to agree. This does not mean that the Letter of Intent failed to create other enforceable obligations.  Where parties contemplate incorporating certain provisions into a subsequent agreement, an agreement to agree can still be capable of enforcement as an agreement *in praesenti*.  *Brown's Shoe Fit, Co. v. OLCH*, 955 P.2d 357, 363 (Utah Ct. App. 1998).  All that is required is that the contemplated provisions are adequately specified to exhibit a meeting of the minds.  *Id.*

To the extent the Letter of Intent created legally enforceable obligations beyond the agreement to agree, none of these obligations required IOSTAR to issue stock to Mr. French.  As discussed above, the Letter of Intent conditioned all stock issuance and expenditure obligations of the parties upon execution of a Memorandum of Understanding and a Definitive Agreement. The Letter of Intent states that "[u]pon MOU execution, GDF will fund all IOSTAR costs, for a

period not to exceed 30 days," Def. French's Mem. in Supp. of Summ. J., Ex. B at 1 (emphasis

added), that "[u]pon MOU execution, GDF will commit and begin to fund all IOSTAR costs,"

*id.* at 3 (emphasis added), and that the IOSTAR Board will agree to "the issuance and sale of

Shares and of preferred stock per MOU at time of MOU execution." *Id.* (emphasis added).

Finally, the Letter of Intent made certain that "[i]f the Definitive Agreement is not executed

within 30 days of MOU execution, the funds invested by GDF will be converted to a Note." *Id.*

at 3.

  Mr. French places great weight on a single statement towards the beginning of the Letter

of Intent that states "[Mr. French's] monthly investment fundings will be monthly purchases of

Preferred shares of IOSTAR." *Id.* at 2. In isolation this statement could suggest that any

investment expenditures made by Mr. French on behalf of IOSTAR would be treated as

purchases of IOSTAR stock. Viewing the Letter of Intent as a whole, however, reveals that Mr.

French not only had no obligation to begin investment funding until after the Memorandum of

Understanding was executed, but also that IOSTAR had no obligation to issue stock until after

such time. Perhaps most importantly, without a Definitive Agreement Mr. French was not

entitled to any Preferred shares. The undisputed facts reveal that the parties never executed a

Memorandum of Understanding, nor did the parties execute a Definitive Agreement. In the

absence of either of these agreements, the Letter of Intent did not require IOSTAR to issue Mr.

French any stock or Preferred shares.

  Mr. French believes that the parties' agreement to forego the Memorandum of

Understanding resulted in purchases of IOSTAR Preferred shares. For the same reasons

discussed above in Section C., however, a reasonable jury could not find that Mr. French

actually purchased any shares. IOSTAR's motion for summary judgment on Mr. French's

breach of contract claim is granted, and Mr. French's second claim for relief is dismissed with prejudice.

(2) <u>Breach of the Implied Covenant of good Faith and fair Dealing</u>

IOSTAR has moved for summary judgment on Mr. French's claim for breach of the duty of good faith and fair dealing.  As discussed above, all contracts contain an implied covenant of good faith and fair dealing that prohibits a party from intentionally interfering with the rights, benefits, and duties of a contract.  *Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 14, 94 P.3d 193.  Mr. French argues that IOSTAR breached this duty by making multiple material misrepresentations in connection with the Letter of Intent, having the effect of depriving him of the benefits of his bargain.  This argument, however, is an inaccurate application of the law to the facts of this case.

As discussed with relation to the breach of contract issue above, the proper cause of action for these misrepresentations is not a claim for breach of the implied covenant of good faith and fair dealing.  If anything, these alleged misrepresentations had the effect of providing Mr. French with the benefits of the Letter of Intent—namely the benefit of acquiring a controlling interest in IOSTAR.  In other words, IOSTAR and Mr. D'Ausilio were not intentionally trying to interfere with Mr. French's rights under the Letter of Intent, but were rather trying to persuade Mr. French to consummate the deal.  Certainly Mr. French would have a cause of action against Mr. D'Ausilio and IOSTAR were misrepresentations actually made in an attempt to induce Mr. French to act to his detriment.  But as discussed above, the proper cause of action would possibly lie in fraud or would seek rescission or voidance of the contract–not breach of an implied covenant of good faith and fair dealing.  IOSTAR's motion for summary

-26-

judgment on this claim is granted, and Mr. French's third claim for relief is dismissed with prejudice.

(3) <u>Fraudulent Inducement and Negligent Misrepresentation</u>

IOSTAR argues that Mr. French's fraudulent inducement and negligent misrepresentation claims against Mr. D'Ausilio can be resolved as a matter of law. With respect to the fraudulent inducement claim, IOSTAR argues that this is a contract-based claim based on an alleged breach of the Letter of Intent. Since Mr. French cannot show a breach of the Letter of Intent, nor any damages flowing from such a breach, IOSTAR argues that the fraudulent misrepresentation claim should be dismissed. IOSTAR fails to address, however, that this cause of action is based in tort, not contract. Under Utah law, where a party claims that he or she was induced to enter into a contract based on fraudulent representations, a tort cause of action may exist. *See Easton v. Wycoff*, 295 P.2d 332, 335 (Utah 1956); *see also Grynberg v. Questar Pipeline Co.*, 2003 UT 8, ¶ 48, 70 P.3d 1. Since IOSTAR does not provide any basis for dismissing this tort cause of action, IOSTAR's motion is denied.

Mr. French's negligent misrepresentation claim appears to seek essentially the same relief as the fraudulent inducement claim, and is therefore duplicative of the fraud claim. Furthermore, the alleged facts underlying the negligent misrepresentation claim are all embodied in or sufficiently closely related to the parties' contractual obligations to invoke the economic loss doctrine under Utah law. *See Grynberg*, 2003 UT 8, ¶ 51; *Associated Diving and Marine Contractors, L.C. v. Granite Constr. Co.*, No. 2:01 Civ. 330, slip op. at 4-6 (D. Utah July 11, 2003). Accordingly, IOSTAR's motion for summary judgment on Mr. French's negligent misrepresentation claim is granted, and the Court dismisses Mr. French's fifth claim for relief with prejudice.

(4) <u>Promissory Estoppel/Detrimental Reliance</u>

IOSTAR has sought summary judgment on Mr. French's claims based on either promissory estoppel or detrimental reliance.  Mr. French pled these causes of action in the alternative, should the Court determine that an enforceable contract does not exist or does not cover all aspects of the parties relationships.  Estoppel, however, is not applicable to this case.

Utah law recognizes a clear distinction between two types of estoppel—promissory estoppel and equitable estoppel.  *Youngblood v. Auto-Owners Insurance Company*, 2007 UT 28, ¶ 12, 158 P.3d 1088.  Equitable estoppel concerns misrepresentations of present or past fact, whereas promissory estoppel concerns future facts.  *Id.* at ¶ 17.  Utah courts "have treated equitable estoppel as a defense raised by a party against whom relief is sought when the other party misrepresented facts, and promissory estoppel as a cause of action against the misrepresentor when it fails to perform."  *Id.*

Mr. French has pled a cause of action based on promissory estoppel.  Mr. French alleges that the IOSTAR parties made certain promises that they should have reasonably expected to induce action or forbearance on the part of Mr. French, that he prudently and reasonably relied on these promises, that the IOSTAR parties knew he was relying on these promises, that the IOSTAR parties should have reasonably expected their promises would induce action or forbearance, that the IOSTAR parties were aware of all material facts, that his reliance resulted in a loss, and that reimbursement for those losses is the only way to avoid injustice.  These allegations track the elements required to plead a case for promissory estoppel.  *See id.* at ¶ 16.

As discussed above, the doctrine of promissory estoppel concerns promises of future intent.  *Id.* at ¶ 19.  Mr. French's allegations concern statements of past or present fact.  For example, some of the "promises" Mr. French alleges induced his actions were statements

concerning IOSTAR's audited financial statements, that IOSTAR had an escrow account for the Xigix money, and that IOSTAR was in compliance with tax laws and regulations.  These so-called promises all concern past or present fact—not promises relating to future action.  As such, any claim that IOSTAR is liable to Mr. French based on promissory estoppel cannot stand.  The proper action would be one for equitable estoppel.  But that doctrine is unavailing as well.  Utah law is clear that equitable estoppel is generally only available as a defense, not an affirmative cause of action.  *Id.*  IOSTAR's motion for summary judgment is granted with respect to Mr. French's promissory estoppel or detrimental reliance claim, and Mr. French's sixth claim for relief is dismissed with prejudice.

> **B.     The IOSTAR Parties' Motion for Summary Judgment on Mr. Stuart's Counterclaims Based on Intentional Interference with Contractual and Economic Relations and Wrongful Discharge**

IOSTAR has moved for summary judgment on Mr. Stuart's claims for intentional interference with contractual and economic relations and wrongful discharge.  These causes of action are based on allegations that Mr. D'Ausilio's actions forced Mr. Stuart to resign, and that Mr. D'Ausilio played an inappropriate role in removing Mr. Stuart from the Board of Directors.  Specifically, Mr. Stuart claims that Mr. D'Ausilio was engaged in unlawful and improper acts that Mr. Stuart refused to ignore.  Additionally, Mr. Stuart states that Mr. D'Ausilio tried to prevent him from reporting his actions to the Board.  Mr. Stuart claims these actions left him with no choice but to resign.

(1) <u>Intentional Interference with Contractual and Economic Relations</u>

To succeed on a claim for intentional interference with contractual or economic relations, a party must demonstrate "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3)

causing injury to the plaintiff." *Anderson Development Co., L.C. v. Tobias*, 2005 UT 36, ¶ 20,

116 P.3d 323 (quoting *Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293, 302 (Utah 1982)).

With respect to the second element, a plaintiff need only prove improper purpose or improper

means—not both. *Id.*

In order to prove improper purpose, a plaintiff must prove that the defendant's actions

were motivated by more than ill-will. *Id.* at ¶ 20. "Rather, the plaintiff must show that the

defendant's 'predominant purpose was to injure the plaintiff.'" *Id.* (quoting *Leigh Furniture*,

657 P.2d at 307). In order to show interference through improper means, the plaintiff must

prove that the means actually used to interfere "were contrary to statutory, regulatory, or

common law or violated an established standard of a trade or profession." *Id.* (quoting *Pratt v.

Prodata, Inc.*, 885 P.2d 786, 787 (Utah 1994) (internal quotations omitted)). Mr. Stuart argues

that Mr. D'Ausilio's acts meet both these elements.

To prove improper purpose, Mr. Stuart must prove that Mr. D'Ausilio's acts were done

with the primary purpose of causing injury to him. Mr. Stuart has not referenced any facts in the

record upon which a jury could find that this was the case. To the contrary, the facts suggest that

Mr. D'Ausilio's refusal to abide by the Board directives was more for his personal benefit than

for the purpose of injuring anyone on the Board. Even if Mr. D'Ausilio's role in removing Mr.

Stuart from the Board was motivated by ill-will, Mr. Stuart has not presented any facts upon

which a reasonable jury could find that Mr. D'Ausilio's primary purpose was to injure Mr.

Stuart.

A cause of action based on intentional interference seems to require that interference

through improper means must be rationally related to the alleged interference. None of the

actions that Mr. Stuart alleges constitute improper means of interfering with his economic

relations, however, concern actual interference.  Mr. Stuart states that Mr. D'Ausilio refused to

comply with IOSTAR resolutions, that Mr. D'Ausilio engaged in fraud and misrepresentations,

potentially criminal conduct, and possibly securities fraud.  Although these actions may have

been inappropriate, Mr. Stuart has not cited facts showing these actions were actually directed at

his economic relations with IOSTAR.  Had Mr. D'Ausilio violated the law, or possibly

IOSTAR's bylaws, in the way he voted to remove Mr. Stuart, improper means could be found.

Mr. Stuart's interference allegations concern his personal decision to resign as IOSTAR's

President and Mr. D'Ausilio's role in removing him as a director.  Mr. Stuart admits that he

decided to withdraw—Mr. D'Ausilio did not personally remove him in violation of any

contractual or legal provision.  Although Mr. Stuart has stated that he believed his only choice

was to tender his resignation as President based on Mr. D'Ausilio's actions, the key to this is that

Mr. Stuart made the decision to resign.  Mr. Stuart could have continued in his position as

IOSTAR's President, but decided against it.  And concerning Mr. Stuart's removal from the

Board, Mr. D'Ausilio did not single-handedly remove him.  As such, Mr. Stuart cannot argue

that Mr. D'Ausilio interfered in any way with his engagement with IOSTAR.  Without such

interference, improper means cannot be shown.  Accordingly, IOSTAR's motion for summary

judgment on this claim is granted, and Mr. Stuart's first cause of action is dismissed with

prejudice.

### (2) Wrongful Discharge

IOSTAR seeks summary judgment on Mr. Stuart's claim for wrongful discharge.  As a

general rule, employment arrangements are considered at-will.  *Rackley v. Fairview Care Ctr.,*

*Inc.*, 970 P.2d 277, 280 (Utah Ct. App. 1998).  This arrangement allows an employer to

terminate an employee for any reason, unless prohibited by law.  *Id.* at 280-81.  An exception to

this rule is provided, however, where the termination of an employee violates "a clear and substantial public policy." *Id.* at 281.

To succeed on a wrongful discharge claim, a plaintiff must satisfy a four-prong test.  An employee must show "(i) that his employer terminated him; (ii) that a clear and substantial public policy existed; (iii) that the employee's conduct brought the policy into play; and (iv) that the discharge and the conduct bringing the policy into play are causally connected." *Id.* (quoting *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 404 (Utah 1998)).  Mr. Stuart's allegations cannot meet these elements.

As a preliminary matter, the wrongful discharge doctrine does not appear to be applicable to this case.  The wrongful discharge doctrine "grew out of a need to protect at-will employees, who are under the total control of the employer and without separate or independent contractual rights that provide employment protections." *MacDougall v. Weichert*, 677 A.2d 162, 166 (N.J. 1996).  As such, "[i]t does not protect independent contractors." *Id.*  Many other courts to have addressed the issue have held similarly.  *See, e.g., Driveaway and Truckaway Service, Inc. v. Aaron Driveaway & Truckaway Company, Inc.*, 781 F.Supp. 548, 551-52 (N.D. Ill. 1991) (refusing to extend the tort of retaliatory discharge to principal-agent relationships); *Ostrander v. Farm Bureau Mut. Ins. Co. of Idaho, Inc.*, 851 P.2d 946, 948-49 (Idaho 1993) (refusing to extend a public policy exception to an independent contractor's discharge that was allegedly due to age or gender); *Birchem v. Knights of Columbus*, 116 F.3d 310, 315 (8th Cir. 1997) (stating that the court was "unaware of any decision that has extended [the public policy exception to the at-will employment rule] to include independent contractors").

Although Mr. Stuart claims that the wrongful discharge doctrine applies to "*all* employment relationships," including independent contractor relationships, Stuart's Mem. in

Opp. to IOSTAR's Mot. for Summ. J. at 15, he has not cited any case law to support extending the doctrine to independent contractors.  Furthermore, he has not cited any case law supporting his position that an independent contractor's working arrangement falls within the category of "employment relationships."

Whether a person is an independent contractor or an employee is not always an easy determination.  Speaking in generalities, employees are paid in terms of wages, fixed rates, or salaries, and are paid to perform work as directed by an employer.  *Harry L. Young & Sons, Inc. v. Ashton*, 538 P.2d 316, 318 (Utah 1975).  Additionally, employees are generally subject to a higher degree of control over the manner of performing duties than are independent contractors, whereas independent contractors are generally "subject to only minimal restrictions or controls and [are] responsible only for [a project's] satisfactory completion."  *Id.*

To make the determination of whether a party is an employer or an independent contractor, Utah courts look at carious factors, including covenants and agreements concerning direction and control, rights to hire or fire, and methods of payment.  *Glover v. Boy Scouts of America*, 923 P.2d 1383, 1386-87 (Utah 1996).  Additionally, courts should consider the parties' intent and the type of business of the employer.  *Id.* at 1387.  And although no one factor is determinative, "whether an employer-employee relationship exists depends upon the [master's] right to control the [servant]."  *Id.* (quoting *Averett v. Grange*, 909 P.2d 246, 249 (Utah 1996) (internal quotations omitted)).

Mr. Stuart argues that IOSTAR has effectively admitted an employment relationship existed when it recognized that Mr. Stuart was to serve "at the pleasure of the CEO and the BOD," and Mr. D'Ausilio retained the authority to dismiss Mr. Stuart at any time.  Stuart's Mem. in Opp. to IOSTAR's Mot. for Summ. J. at 16.  This position is plausibly supported by

some terms of the engagement agreement as well.  For example, the agreement provides that either Mr. Stuart or Mr. D'Ausilio could terminate the relationship at any time, mimicking the general at-will employment rule.  Additionally, the agreement provides that Mr. Stuart is to receive a per-hour wage for his services, also suggesting that Mr. Stuart was an employee.  A brief reading of the engagement agreement, however, reveals that the parties intended to establish an independent contractor relationship.

The engagement agreement defines Mr. Stuart's duties in broad and general terms.  For example, Mr. Stuart was to "[h]elp recruit and secure . . . strategic partners, . . . [c]oordinate actions on existing efforts to secure support and funding, . . . [s]erve as the chief spokesperson to represent IOSTAR, . . . [e]stablish and maintain strong business relationships, . . . [and] [h]elp mold the existing organizational structures, cultures, and strategies of IOSTAR."  *Id.* Ex. 1 at 1.  The agreement does not, however, include any provision limiting the authority with which Mr. Stuart is to perform his duties.  Because Mr. Stuart was to work from his home office in Colorado, the logical conclusion is that Mr. Stuart retained authority over the manner of his performance.  Furthermore, Mr. Stuart's own testimony reveals that IOSTAR retained very little control over how he was to meet his duties under the agreement.  Mr. Stuart stated that he did need to worry about "defined limits" and that he did not need "to worry about a predefined authority limit." Stuart's Dep. at 88, lines 8-13, p. 89, lines 8-14.

As previously stated, the primary factor for making a determination concerning employee status is which party remains in control of how directives are achieved—not whose "pleasure" one serves at.  In this case, the facts cited above indicate that Mr. Stuart remained in control of how he achieved the IOSTAR objectives.  His own testimony supports this finding.  This renders

-34-

Mr. Stuart an independent contractor and therefore unable to invoke the wrongful discharge
doctrine.

Even if the doctrine applied to Mr. Stuart, he could not prevail on his wrongful discharge
claim as he was not discharged by IOSTAR, constructively or otherwise.  Utah courts recognize
that an employee can be constructively discharged for purposes of wrongful termination in
violation of public policy.  *Touchard v. La-Z-Boy, Inc.*, 2006 UT 71, ¶ 27, 148 P.3d 945.  To
qualify as constructive discharge, however, working conditions must be so intolerable that a
reasonable employee would feel compelled to resign.  *Id.*; *see also Yearous v. Niobrara County
Memorial Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997).  Where a plaintiff resigns voluntarily,
even if resulting from the defendant's actions, the constructive discharge doctrine does not
apply.  *See Yearous*, 128 F.3d at 1356.  Finally, if the employee has another reasonable choice
besides resignation, constructive discharge has not occurred.  *Tran v. Trs. of State of Colls. of
Colo.*, 355 F.3d 1263, 1270 (10th Cir. 2004).  For constructive discharge to occur, "a plaintiff
must show that [objectively] she had *no other choice* but to quit."  *Yearous*, 128 F.3d at 1356
(citations and quotations omitted).

In this case, Mr. Stuart conclusively states that "[he] felt [he] could not take part in
D'Ausilio's actions and was forced to resign as President."  Stuart's Decl. ¶ 25.  Similarly, Mr.
Stuart and other Board members summarily stated that if Mr. D'Ausilio refused to abide by the
Board's resolution that he repay misappropriated funds, then the Board "will have no choice but
to resign."  Stuart's Mem. in Opp. to IOSTAR's Mot. for Summ. J., Ex. 9.  Aside from these
conclusory statements, however, Mr. Stuart has not shown that a reasonable person in his
position would have felt compelled to resign.  Indeed, Mr. Stuart states that it was his personal
decision to resign because he felt that he could not participate in Mr. D'Ausilio's actions.  Mr.

Stuart does not indicate that Mr. D'Ausilio ever asked or required him to participate in any illegal, unethical, or inappropriate conduct.  Furthermore, Mr. Stuart has not shown that Mr. D'Ausilio's actions interfered with his ability to perform his job or that Mr. D'Ausilio's conduct exposed him to any liability.  Finally, Mr. Stuart has not claimed that Mr. D'Ausilio's actions made working conditions difficult, uncomfortable, or unbearable.  In the absence of facts suggesting that working conditions had become unbearable, a reasonable jury could not find that Mr. Stuart was left with no other choice than to resign. Accordingly, IOSTAR's motion is granted and Mr. Stuart's second cause of action is dismissed with prejudice.

## CONCLUSION

In conclusion, the Court rules and orders as follows:

1.      Mr. Stuart's Motion for Summary Judgment is GRANTED in part and DENIED in part. IOSTAR's first, second, fourth, seventh, and ninth causes of action for conversion, violation of the Utah Uniform Trade Secrets Act, civil conspiracy, breach of contract, and breach of implied covenant of good faith are DISMISSED with prejudice.  IOSTAR's fifth cause of action for breach of fiduciary duty is DISMISSED without prejudice.  With respect to Mr. Stuart's third cause of action for repayment of attorney fees, his motion is DENIED.

2.      Mr. Busch's Motion for Summary Judgment is GRANTED.  IOSTAR's first, second, and fourth causes of action for conversion, violation of the Utah Uniform Trade Secrets Act, and civil conspiracy are all DISMISSED with prejudice.  Additionally, IOSTAR's third and eleventh causes of action for injunctive relief are also DISMISSED with prejudice. IOSTAR's thirteenth cause of action for aiding and abetting breach of fiduciary duty is DISMISSED without prejudice.

3.      Mr. French's Motion for Summary Judgment is GRANTED in part and DENIED in part. IOSTAR's first, second, fourth, eighth, and ninth causes of action for conversion, violation of the Utah Uniform Trade Secrets Act, civil conspiracy, breach of contract, and breach of implied covenant of good faith are DISMISSED with prejudice. IOSTAR's thirteenth cause of action for aiding and abetting breach of fiduciary duty is DISMISSED without prejudice. Mr. French's Motion for Summary Judgment on his first claim for relief for violation of the Utah Uniform Securities Act is DENIED.

4.      IOSTAR's Motion for Summary Judgment on all Claims Asserted Against it by Mr. French is GRANTED in part and DENIED in part. Mr. French's first, second, third, fifth, and sixth claims for relief for violation of the Utah Uniform Securities Act, breach of contract, breach of the duty of good faith and fair dealing, negligent misrepresentation, and detrimental reliance/promissory estoppel are DISMISSED with prejudice. Respecting Mr. French's fourth claim for relief for fraudulent inducement, IOSTAR's motion is DENIED.

5.      IOSTAR's Motion for Summary Judgment on the First and Second Causes of Action of Mr. Stuart's Counterclaim is GRANTED. The Court DISMISSES Mr. Stuart's first and second causes of action for intentional interference with contractual and economic relations and wrongful discharge in violation of public policy with prejudice.

IT IS SO ORDERED.

Dated this 2nd day of February, 2009.

Dee Benson
United States District Judge